**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| etouches, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>Swoogo, LLC; Swoogo Limited;<br>Leonora Valvo; Timothy Cummins;<br>and Neil Keefe,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff etouches, Inc., ("Plaintiff", "etouches" or the "Company") through its attorneys, Diserio, Martin, O'Connor and Castiglioni, allege as follows against Defendants Swoogo, LLC, Swoogo Limited, Leonora Valvo, Timothy Cummins, and Neil Keefe.

## INTRODUCTION

1. This action arises out of a scheme devised and implemented by the Defendants, by and through their principal members and directors Leonora Valvo ("Valvo"); Tim Cummins ("Cummins"); Neil Keefe ("Keefe") (Valvo, Cummins and Keefe referred to collectively as the "Individual Defendants"), while employed with etouches or under contractual obligations therewith, to misappropriate etouches' trade secrets and other confidential information in furtherance of a plan to unfairly compete with etouches. For the benefit of their new companies, Defendants Swoogo LLC and Swoogo Limited (collectively "Swoogo"), Valvo, Cummins and Keefe exploited contacts and information they developed with the Company while they were Executives and while owing fiduciary and contractual duties to the Company.

2. Accordingly, Plaintiff seeks injunctive relief and damages against Defendants for: (1) breach of Valvo and Cummins' Settlement Agreement with Plaintiff; (2) breach of Keefe's Obligations Agreement with Plaintiff; (3) tortious interference with Keefe's covenant not to compete with Plaintiff; (4) misappropriation of etouches trade secrets and confidential business information in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1839 ("DTSA") and (5) the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 et seq. ("CUTSA"); (6) violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"); (7) tortious interference with prospective business relations; (8) false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (9) unfair competition in violation of the common law.

## PARTIES

3. etouches, Inc. is a Delaware corporation doing business in the State of Connecticut with its principal place of business located at 13 Marshall Street, Norwalk, Connecticut 06854. The Company provides web-based event management software and associated services. See, https://www.etouches.com/event-software/.

4. The Defendant, Leonora Valvo ("Valvo"), is, upon information and belief, an individual with a business and residence address at 2 Over Rock Lane, Westport, CT 06880 and a Director of Defendant Swoogo Limited and a Member of Defendant Swoogo LLC.

5. The Defendant Neil Keefe, is, upon information and belief, an individual with a business address at 23 Priest Hill, Caversham, Reading, United Kingdom and a Director of Defendant Swoogo Limited.

6. The Defendant Timothy Cummins is, upon information and belief, an individual with a business address at 23 Priest Hill, Caversham, Reading, United Kingdom and a Director of Defendant Swoogo Limited and a Member of Defendant Swoogo LLC.

7. The Defendant, Swoogo LLC is, upon information and belief, a limited liability company organized in Florida with a registered address at 4646 Ashton Road, Sarasota, Flordia 34233 and a mailing address at 157 Imperial Avenue, Westport, Connecticut.

8. The Defendant, Swoogo Limited is, upon information and belief, a limited company incorporated in the United Kingdom with a registered address at 23 Priest Hill, Caversham, Reading, United Kingdom.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction to claims arising under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., pursuant to 28 U.S.C. §§ 1331.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Plaintiff's pendent state and common law claims because they arise out of the same facts and circumstances as the federal claims.

11. Venue is proper in this district because at all times relevant to this action Plaintiff's principal place of business was within this district and a substantial part of the events giving rise to this action occurred in this district.

12. This Court has personal jurisdiction over Defendants because they regularly do business in this judicial district, and have misappropriated trade secrets in Connecticut and in this district. Upon information and belief, Defendants derives significant benefits from their misappropriation of trade secrets, intentional interference with etouches' economic advantage,

intentional misrepresentation, engagement in fraudulent business practices, and breach of contract within this district, and know their actions will have consequences within this district.

## STATEMENT OF FACTS

### A. Individual Defendants Valvo and Cummins' Employment with Plaintiff and Settlement Agreement

13. For more than 15 years, Plaintiff has been in the event management services and software as a service (SaaS) industries, and providing web-based event management software and associated services. *See* Exhibit A.

14. Plaintiff derives revenue from the sale of products and services including modules for scheduling, budgeting, registration, seating, appointment setting/networking, venue sourcing, email marketing, surveys, mobile, and event websites, all of which are delivered to clients through a subscription model.

15. Plaintiff's revenue resulting from the provision of its centralized event management platform exceeds eight million dollars per year.

16. Defendant Valvo was a founder of etouches in 2008.

17. During her tenure at etouches, Valvo held the title and responsibilities of Chief Executive Officer ("CEO") of the Company, and served as a director on the Company's Board of Directors ("BOD").

18. Valvo was responsible for overseeing and leading the senior Management Team at etouches, as well as leading and managing customer growth, financial performance, and operational execution.

19. Valvo was removed as CEO and from the BOD and placed on paid administrative leave on September 3, 2013, due to significant performance issues at etouches, including the

departure of numerous senior managers, and reports of self-dealing, dishonesty, misappropriation of customer funds and abuse of travel and expense policies.

20. After a thorough investigation into these issues by the BOD, Valvo was terminated from etouches on or about December 3, 2013.

21. On or about July 25, 2014, etouches entered into a Stock Purchase, Settlement Agreement and Release ("Settlement Agreement") with Valvo, Timothy W. Cummins ("Cummins"), and Chett Rubenstein ("Rubenstein").

22. Cummins was formerly employed by etouches as Chief Software Architect.

23. Rubenstein was formerly employed by etouches as Chief Technology Officer, having resigned from etouches on February 21, 2014. Upon information and belief, Valvo and Rubenstein are married.

24. Under the Settlement Agreement, Valvo, Cummins and Rubenstein agreed to sell, transfer, convey and assign to etouches all of their shares of common stock of etouches ("Shares"). As consideration for the Shares, etouches agreed to pay to Valvo, Cummins and Rubenstein $1.5 million in the aggregate, consisting of a lump sum payment of $1 million and further payments on each of October 30, 2014, January 30, 2015, April 30, 2015 and July 30, 2015, totaling $500,000; further consideration included the issuance of warrants to Valvo, Cummins and Rubenstein to purchase "warrant shares" of common stock of etouches representing 2% of the then-current capitalization of etouches.

25. Section 10 of the Settlement Agreement, entitled "Confidentiality," provides, in relevant part, as follows:

> (b) No Seller shall (i) disclose any Proprietary Information (as defined below) to any person unless, subject to Section 10(c), such disclosure is required by law or (ii) utilize such Proprietary Information to compete against the Company. In the event that any Seller is required by law to disclose Proprietary Information, then such Seller shall

> promptly notify the Company so that the Company shall have the ability to seek an appropriate protective order prior to such Seller making such disclosure. "Proprietary Information" means information that is not generally known to the public and that is used, developed or obtained by the Company or any affiliate in connection with its business, including without limitation information concerning (i) the business or affairs of the Company (or such predecessors), (ii) products or services, (iii) fees, costs and pricing structures, (iv) designs, (v) analysis, (vi) drawings, photographs and reports, (vii) computer software, including operating systems, applications and program listings, (viii) flow charts, manuals and documentation, (ix) data bases, (x) accounting and business methods, (xi) inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice, (xii) Customer Information (as defined below), (xiii) copyrightable works, (xiv) all production methods, processes, technology and trade secrets, (xv) business strategies, acquisition plans and candidates, financial or other performance data and personnel lists and data, and (xvi) all similar and related information in whatever form.
>
> (c) Promptly following the date hereof, each Seller shall immediately deliver to the Company all tangible property that embodies or contains any Proprietary Information, including books, notes, memoranda, record, correspondence, documents, computer and other discs and tapes, data listings, codes, designs, drawings and other documents and materials relating to the business of the Company, whether prepared or developed by or with the assistance of such Seller or otherwise coming into such Seller's possession, custody or control and shall certify that all such property has been handed over on request by the Company.

26. Section 11(c) of the Settlement Agreement defines "Customer Information" as follows: "Customer Information includes, but is not limited to, names, phone numbers, addresses, e-mail addresses, order history, order preferences, chain of command, pricing information and other information identifying facts and circumstances specific to the customer and relevant to sales and/or services."

27. Section 11(a) of the Settlement Agreement, entitled "Non-Disparagement," provides as follows:

> (a) Non-Disparagement. Each Seller agrees not to make or encourage others to make any statement, publicly or privately, verbally or in writing, whether or not such statement is truthful, or take any action that is or could reasonably be construed as derogatory, disparaging, and/or otherwise inflammatory about the Company or any of the Company Releases. The Company similarly agrees that neither the Company nor any of the Company Releases under its control shall make or encourage others to make any

statement or take any action that is or could reasonably be construed as derogatory, disparaging and/or otherwise inflammatory about the Sellers.

28. Section 16 of the Settlement Agreement, entitled "Remedies," provides as follows:

> (a) Because each Seller's services to the Company were unique and because each Seller had access to Proprietary Information, in the event of a breach or threatened breach by any Seller of any of the provisions of this Agreement, such Seller hereby consents and agrees that the Company shall be entitled, in addition to other available remedies, to the entry of a temporary and/or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. Each Seller hereby agrees that any such breach would cause irreparable harm to the Company and leave it without an adequate remedy at law. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

29. Section 17 of the Settlement Agreement, entitled "Governing Law; Jurisdiction," provides as follows:

> Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to it conflicts of laws principles. Except for an action to enforce the restrictive covenants in Section 11, which may be brought by the Company in any court of competent jurisdiction, the parties consent to the exclusive jurisdiction of the state and federal courts of Connecticut for the purpose of any suit, action or other proceeding arising out of or otherwise related to this Agreement, and expressly waive any and all objections they may have as to venue in any such courts. In accordance with Section 12 above, in any dispute or action to enforce the rights and obligations outlined in this Agreement, the prevailing party shall be entitled to recover, in addition to damages or other available remedies, its reasonable attorneys' fees and costs incurred.

30. The closing under the Settlement Agreement occurred, etouches made all payments and issued all warrants under the Settlement Agreement, and etouches otherwise performed all obligations required of it under the Settlement Agreement.

31. The Effective Date of the Settlement Agreement was August 2, 2014.

**B. Keefe's Employment and Obligations Agreement with Plaintiff**

32. Individual Defendant Neil Keefe was employed with etouches from December 5, 2008 until his resignation on November 15, 2015.

33. During his tenure, Neil Keefe served as the Director of Product Development and Support and the Vice President of Product.

34. While Director of Product Development and Support, Keefe was responsible for, among other things, the development and documentation of coding standards and policies, working closely with the Chief Technology Officer and the rest of the Executive Team to set development priorities based on roadmap and resource availability.

35. While Vice President of Product, Keefe was responsible for, among other things, working closely with the Executive Team to drive the ideation and evolution of etouches' event automation platform, communicating and effecting the company’s strategic plan to the product team, and engaging clients at the C-level to understand needs and gather product requirements.

36. On March 3, 2010, Keefe executed an “Obligations Agreement” with Plaintiff. Valvo signed the Obligations Agreement on behalf of etouches.

37. Section 2(a) of the Obligations Agreement, entitled “Confidential Information,” provides, in relevant part, as follows:

> (a) I acknowledge that, except to the extent otherwise provided below in this Section 2, all Confidential Information disclosed to or acquired by me is a valuable, special, and unique asset of the Company and I will hold such Confidential Information in trust for the Company's sole benefit. Except as otherwise provided below in this Section 2, I shall not, at any time (including, without limitation, after the Term), use for myself or others, or disclose or communicate to any person for any reason, any Confidential Information without the prior written consent of the Company.

38. Section 5 of the Obligations Agreement, entitled “Return of Documents,” provides as follows:

> Return of Documents. Upon the termination of my association with the Company as an Employee, consultant, officer or director or, if earlier, upon the request of the Company, I

will promptly deliver to the Company, all documents and all other tangible media (including all originals, copies, reproductions, digests, abstracts, summaries, analyses, notes, notebooks, drawings, manuals, memoranda, records, reports, plans, specifications, devices, formulas, storage media, including software, and computer printouts) in my actual or constructive possession or control that contain, reflect, disclose or relate to any Confidential Information, Assigned Inventions or Proprietary Rights. I will destroy any related computer entries on equipment or media not owned by the Company.

39. Section 6 of the Obligations Agreement, entitled "Covenant Not to Compete," provides as follows:

Covenant Not to Compete. I agree that the services to be rendered by me to the Company are special and unique. I agree that, during the period commencing on the date of this Agreement and ending twelve (12) months after the termination of my employment or engagement for any reason, I shall not, as an owner, part-owner, partner, director, officer, trustee, Employee, agent, consultant, joint venturer, stockholder, representative, sole proprietor, independent contractor or in any other capacity, directly or indirectly engage in or participate in, on my own behalf or the behalf of any business, organization or entity, any activity which is in competition with the then existing or planned business of the Company, including without limitation, any products or services then being developed, produced, manufactured, provided or marketed by the Company or any subsidiary of the Company. The foregoing shall not prohibit me from owning one percent (1%) or less of the outstanding equity securities of any corporation whose equity securities are regularly traded on any national stock exchange or recognized "over-the-counter" market, nor shall it prohibit me from owning any interest, whether as a creditor or stockholder, in the Company.

40. Section 7 of the Obligations Agreement, entitled "Non-solicitation," provides as follows:

Non-solicitation. During the period commencing on the date of this Agreement and ending twelve (12) months after the termination of my employment or engagement for any reason, I shall not, as an owner, part-owner, partner, director, officer, trustee, Employee, agent, consultant, joint venturer, stockholder, sole representative, sole proprietor or independent contractor, or in any other capacity directly or indirectly (a) solicit, divert or take away any of the customers or business of the Company or its subsidiaries existing at the time of the termination of my employment or other engagement for the Company (except to the extent my solicitation, diversion or taking away is with respect to a product or service that is not in competition with the products or services being developed, produced, manufactured, provided or marketed by, or then included in the business plan for implementation by, the Company at the date of the termination of my employment or other engagement for the Company), or (b) solicit or discuss with any Employee of the Company or any of its subsidiaries, or with anyone who was an Employee of the Company or any of its subsidiaries within the six (6) month

period prior thereto, the employment or other retention of such person by any other company, business organization or other entity.

41. Sections 6 and 7 of the Obligations Agreement contain non-solicitation and non-competition agreements, prohibiting Keefe from soliciting etouches employees and customers for a period of twelve (12) months after the termination of his employment; and from owning, engaging, or participating in any activity which is in competition with the then existing or planned business of the Company, for a period of twelve (12) months after the termination of his employment ("Restrictive Covenants").

42. The Effective Date of the Restrictive Covenants was the date of Keefe's resignation, November 15, 2015.

43. Accordingly, Keefe was under a duty not to compete with etouches or solicit etouches customers from November 15, 2015 until November 15, 2016.

44. The confidentiality and non-disclosure requirements of the Obligations Agreement do not expire. Accordingly, pursuant to the Obligations Agreement, Keefe remains under a duty of confidentiality with respect to Confidential Information of etouches he gained during his employment.

**C. Individual Defendants Access to Plaintiff's Proprietary and Trade Secret Materials and Information**

45. As part and parcel of their job responsibilities with etouches, the Individual Defendants were familiar with etouches' proprietary network, computer systems, and data, containing information valuable to Plaintiff's business, including but not limited to, software, customer contacts and lists, client specifications, customization of services for clients, sensitive pricing and financial information, regular business practices and expansion strategies, all of which are trade secrets, and comprise confidential and proprietary information of Plaintiff, and

which is protected by security methods ("Plaintiff's Proprietary and Trade Secret Materials and Information").

46. The Individual Defendants contributed to the formulation of business strategies and objectives, and gained extensive knowledge of and familiarity with intimate details Plaintiff's Proprietary and Trade Secret Materials and Information. Indeed, Individual Defendants' familiarity with, and use of, such Plaintiff's Proprietary and Trade Secret Materials and Information was integral to the performance of their duties while employed by etouches.

47. etouches developed all of the Proprietary and Trade Secret Materials and Information to which Individual Defendants were exposed at significant cost in time and money. This Proprietary and Trade Secret Materials and Information gives etouches an advantage over competitors and derives independent economic value from not being generally known to, or readily ascertainable through proper means by, other persons who could obtain economic value from its disclosure or use.

48. etouches does not publish, disseminate, or otherwise make its Proprietary and Trade Secret Materials and Information available to any third parties or the public. To the contrary, etouches closely guards the secrecy of its Proprietary and Trade Secret Materials and Information to prevent it from becoming available to persons other than its duly authorized employees and agents.

49. These measures are reasonable and include, but are not limited to, requiring that all employees having access to the Proprietary and Trade Secret Materials and Information execute an Employment Agreement containing nondisclosure covenants, reminding employees of their confidentiality responsibilities in its Employee Handbook, limiting the number of employees with access to Proprietary and Trade Secret Materials and Information, and requiring

employees with such access to immediately return any and all documents containing or referring to such information upon termination of employment.

50. Furthermore, Valvo and Cummins, pursuant to the confidentiality and non-disclosure terms of the Settlement Agreement, remain under a duty not to disclose any Proprietary Information or utilize such Proprietary Information to compete against the Company.

51. Similarly, Keefe, pursuant to the confidentiality and non-disclosure requirements of the Obligations Agreement, remains under a duty of confidentiality with respect to Confidential Information of etouches he gained during his employment.

**D. Defendants Breach of Their Agreements and Launch Swoogo Entities to Unfairly Compete with etouches**

52. Upon information and belief, at various times since August 2, 2015, Defendants have made disparaging and false statements about etouches and its business, in an effort to establish Swoogo and its products in the market place.

53. In mid-August 2015, etouches learned of a website for Defendants' new company, Swoogo (www.swoogo.com). *See* Exhibit B. Said website made false and explicitly disparaging remarks about etouches and its products. Mentioning etouches by name, the text stated unequivocally that etouches' software "wasn't equipped to handle the rapidly evolving event tech landscape" and that etouches "couldn't give [its] clients what they needed …." It went on to misrepresent that Valvo voluntarily left etouches because etouches was unwilling to "re-invent the wheel." The site further included a derogatory reference to etouches technology as "our old bag of tricks."

54. Those defamatory statements constituted a blatant violation of the non-disparagement clause contained at Section 11(a) of the Settlement Agreement.

55. etouches, through counsel, demanded that the Defendants remove the disparaging language from the Swoogo website.

56. The Defendants removed some of the disparaging language in late-August 2015.

57. The balance of the disparaging language was removed from the Swoogo website weeks later after multiple follow-ups by etouches' counsel, and for which etouches incurred legal fees and costs; the episode also caused a substantial interruption in etouches' business and caused etouches' executives to devote time and resources to address these issues.

58. On September 21, 2016, Matthew Hodge, Sales Director of Swoogo, sent out a marketing email that stated, among other things, that Swoogo is "a new event management software solution created by the very same team that created etouches" and that "Swoogo is the only tool on the market that combines deep registration functionality within a modern user interface." *See* Exhibit C. Both of these statements are objectively false.

59. On or about November 26, 2015, Valvo, Cummins, and Keefe registered Defendant, Swoogo Limited, with the Companies House of the United Kingdom, naming themselves as the three Directors of the limited Company.

60. On or about November 16, 2015, Valvo and Cummins registered Defendant, Swoogo LLC, with the Florida Department of State, naming themselves as the only two members of the LLC.

61. Also unbeknownst to etouches, on December 14, 2015, Swoogo LLC also filed an application for registration of the trademark SWOOGO with the U.S. Trademark Office, Serial No. 86849145 for goods and services in International Class 42: "Providing temporary use of online computer software applications to enable event organizers to sell tickets and registrations, process payment, print tickets and receipts, scan and validate tickets and registrations, and track

daily and current event sales while onsite, and to enable event attendees to search for events, purchase tickets and registrations, and access information related to events they may be interested in." *See* Exhibit D.

62. The SWOOGO application was filed as an in-use application with a date of first use in commerce as August 2, 2015. *See* Exhibit D.

63. Cummins, on behalf of Swoogo, LLC, registered the www.swoogo.com domain name. *See* Exhibit E.

**E. Recruitment of Keefe and Violation of Restrictive Covenants**

64. Upon information and belief, within ten days of Keefe's termination of employment with Plaintiff on November 15, 2015, he assisted in the formation and organization of Swoogo Limited.

65. Upon information and belief, Keefe became Head of Product Development at Swoogo, and was otherwise engaged as an employee, independent contractor and/or service provider for the Swoogo venture, and was instrumental in developing the Swoogo platform. He is presently listed on the Swoogo website as responsible for "Technology."

66. The foregoing actions by Keefe were taken in contravention of Keefe's Obligations Agreement.

67. Valvo was fully aware of Keefe's non-competition obligations because Valvo signed to the Obligations Agreement on behalf of etouches.

68. Upon information and belief, Valvo and Cummins solicited Keefe while he was employed with etouches to join Swoogo in violation of the Obligations Agreement.

**F. Plaintiff's Investigation of Swoogo Platform and Discovery of Etouches Material**

69. Concerned that the Swoogo platform was utilizing etouches Proprietary and Trade Secret Materials and Information and that Swoogo employees, independent contractors and others working on behalf of Swoogo, were contacting etouches' customers, Plaintiff and its counsel engaged a Private Investigator to investigate Swoogo's platform and back-end architecture.

70. Plaintiff's Investigator engaged a cooperating subject ("CS") to connect with Swoogo and secure a demonstration. The CS also participated in the subsequent demonstration of the Swoogo software.

71. Plaintiff's Investigator and CS were invited to and participated in an online demonstration of the Swoogo software by Matthew Hodge, a Sales Director for Swoogo.

72. The online demonstration was held on November 2, 2016 through a GoToMeeting session, which is an online meeting, desktop sharing and video conferencing software that enables the user to meet with others via the internet in real time.

73. Plaintiff's Investigator conducted a video capture of the demonstration.

74. During the demonstration, Hodge showed several sample event websites and the event setup module of Swoogo covering various topics such as event details, registrant types, registration forms and payment methods.

75. During the demonstration, the desktop screen of Hodge's computer was visible several times as he switched from different windows or selected files.

76. At 8:54 AM, twenty-four minutes into the presentation, as Hodge selected a file from his computer, Plaintiff's Investigator observed a Microsoft Excel workbook file named "etouchesUsers" with a date modified of 8/29/2016, among the files available in the folder at the path: "This PC > Desktop". *See* Exhibit F.

77. At 9:21 AM, Plaintiff's Investigator again observed a Microsoft Excel workbook icon with a partially visible filename of "etouchesUS" visible in the upper right quadrant of Hodge's computer desktop screen. *See* Exhibit G

78. Upon information and belief, the file named "etouchesUsers" contains proprietary and trade secret customer information of etouches that was misappropriated and utilized by the Individual Defendants in contravention of their contractual obligations to etouches.

79. The demonstration further revealed that the Swoogo software platform replicates certain aspects of etouches software platform, including replication of URL architecture, file structures, icons, and menu options. *See* Exhibit H.

**G. Defendants Acts of Unfair Competition**

80. Upon information and belief, Defendants have directly and/or indirectly solicited business from etouches' customers and prospective customers, and diverted, or attempted to divert such business from etouches to Swoogo using etouches' Proprietary and Trade Secret Materials and Information.

81. Upon information and belief, in furtherance of their competitive efforts on behalf of Swoogo, Individual Defendants Valvo and Cummins used etouches' Proprietary and Trade Secret Materials and Information learned solely on account of their former employment by etouches, thereby directly violating the Settlement Agreement.

82. Upon information and belief, Individual Defendant Keefe assumed ownership of a competitive entity, Swoogo Limited, prior to the expiration of his covenant not to compete contained in the Obligations Agreement.

83. Upon information and belief, in furtherance of his competitive efforts on behalf of Swoogo, Keefe used etouches' Proprietary and Trade Secret Materials and Information he gained during his employment, thereby directly violating the Obligations Agreement.

84. Upon Information and belief, Valvo and Cummins solicited Keefe during his employment, thereby directly violating the Settlement Agreement.

85. Swoogo is aware of the existence and terms of the Settlement Agreement and Obligations Agreement and, upon information and belief, was or should have been aware of the existence and terms of those Agreements since at least the time Swoogo retained, engaged or otherwise employed or contracted with the Individual Defendants.

86. Swoogo has benefited or will benefit from the Individual Defendants' possession and use of etouches' Proprietary and Trade Secret Materials and Information.

87. All defendants knew or should have known that information that Individual Defendants provided and/or used on Swoogo's behalf included Proprietary and Trade Secret Materials and Information. Further, all defendants knew or should have known that disclosure or use of such trade secrets constituted a breach of their agreements with etouches and was otherwise contrary to law. Despite such knowledge or notice, defendants have continued, directly or indirectly, to use those trade secrets to unfairly compete directly against etouches.

88. Upon information and belief, the Defendants have used and continue to use this information to interfere with the Plaintiff's relationships with its clients and to divert business away from the Plaintiff.

## CLAIM I
## BREACH OF CONTRACT
## (AGAINST INDIVIDUAL DEFENDANTS VALVO AND CUMMINS)

89. Plaintiff restate and reaver each and every allegation contained in Paragraphs 1-88, inclusive of this Complaint and the acts of the Defendants asserted therein as if fully stated in this paragraph.

90. On or about July 25, 2014, etouches entered into the Settlement Agreement with Cummins and Valvo.

91. Pursuant to the Settlement Agreement, Cummins and Valvo were subject to restrictions regarding the use of Plaintiff's Confidential Information, including, but not limited to, Customer Information, and from making disparaging statements about Plaintiff.

92. Upon information and belief, Cummins and Valvo's actions have breached the express Confidentiality and Non-Disparagement provisions of the Settlement Agreement.

93. The actions of Cummins and Valvo have damaged Plaintiff in many ways, all to an extent and amounts that is to be further ascertained. In addition, Cummins and Valvo's actions have irreparably harmed and will continue to harm Plaintiff in ways and extents for which there is no adequate remedy at law.

**CLAIM II**
**BREACH OF CONTRACT**
**(AGAINST INDIVIDUAL DEFENDANT KEEFE)**

94. Plaintiff restate and reaver each and every allegation contained in Paragraphs 1-93, inclusive of this Complaint and the acts of the Defendants asserted therein as if fully stated in this paragraph.

95. On March 3, 3010, Keefe executed an "Obligations Agreement" with Plaintiff.

96. Sections 6 and 7 of the Obligations Agreement contain non-solicitation and non-competition agreements, prohibiting Keefe from soliciting etouches employees and customers for a period of twelve (12) months after the termination of his employment; and from owning,

engaging, or participating in any activity which is in competition with the then existing or planned business of the Company, for a period of twelve (12) months after the termination of his employment.

97. Upon information and belief, Keefe's actions have breached the express provisions of the Obligations Agreement.

98. Keefe's actions have damaged Plaintiff in ways, extents and amounts to be further ascertained. In addition, Keefe's actions have irreparably harmed and will continue to harm Plaintiff in ways and extents for which there is no adequate remedy at law.

**CLAIM III**
**TORTIOUS INTERFERENCE**
**(AGAINST SWOOGO AND INDIVIDUAL DEFENDANT VALVO)**

99. Plaintiff restate and reaver each and every allegation contained in Paragraphs 1-98, inclusive of this Complaint and the acts of the Defendants asserted therein as if fully stated in this paragraph.

100. A beneficial contractual relationship and expectancies existed between Plaintiff and Keefe.

101. Defendants Swoogo and Valvo were at all times aware of these beneficial contractual relationships and expectancies.

102. Upon information and belief, without privilege or justification, these defendants intentionally and tortiously interfered with these beneficial contractual relationships and expectancies, as well as with Plaintiff's economic advantage, through its wrongful conduct.

103. Upon information and belief, these defendants undertook the complained of activities knowing about these beneficial contractual relationships and expectancies and in willful and malicious disregard thereof.

104. These defendants' actions have damaged Plaintiff in ways, extents and amounts to be further ascertained. In addition, these actions have irreparably harmed and will continue to irreparably harm Plaintiff in ways and extents for which there is no adequate remedy at law.

**CLAIM IV**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1839**
**(AGAINST ALL DEFENDANTS)**

105. Plaintiff restate and reaver each and every allegation contained in Paragraphs 1-104, inclusive of this Complaint and the acts of the Defendants asserted therein as if fully stated in this paragraph.

106. The actions of Defendants, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1839 ("DTSA").

107. Plaintiff possessed Plaintiff's Proprietary and Trade Secret Materials.

108. Defendants have used for its own purposes, Plaintiff's Proprietary and Trade Secret Materials in their wrongful possession.

109. As employees and members of the Senior Management Team of Plaintiff, Individual Defendants had access to and used Plaintiff's Proprietary and Trade Secret Materials and Information in order to effectuate their employment with Plaintiff and work with Plaintiff's clients.

110. On information and belief, Individual Defendants have used and otherwise misappropriated and continue to misappropriate Plaintiff's Proprietary and Trade Secret Materials and Information without etouches' express or implied consent, including trade secrets regarding etouches clients and prospective clients. These actions were taken with the knowledge and for the benefit of Swoogo.

111. The information used by Defendants is of extreme importance and value to the Plaintiff who has put in great effort, time, and cultivation of relationships with their clients in order to develop these trade secrets and now affords Plaintiff an advantage in the marketplace.

112. This information is closely held and not known outside the Plaintiff's business.

113. The information is not readily ascertainable by outsiders.

114. This information is only given to those parties absolutely necessary in order to preserve the secrecy of said information.

115. The Defendants acquired these trade secrets by improper means or under circumstances giving rise to a duty to maintain their secrecy and used them to the detriment of the Plaintiff.

116. Plaintiff has sustained damages and injury as a result of the Defendants' misappropriation of Plaintiff's Proprietary and Trade Secret Materials and Information and has damaged the integrity of Plaintiff's confidential information and business integrity.

117. The Defendants have used this information in order to try to disrupt the Plaintiff's relationship with their clients and to try and divert business away from the Plaintiff.

118. Defendants conduct constitutes a violation of DTSA.

119. Plaintiff will also suffer irreparable damage and injury due to Defendants misappropriation of the trade secret information if the Defendants are not enjoined from the use of such information. There is no adequate remedy at law to compensate for the Plaintiff's damage and injury which the Defendants continue to misappropriate.

120. Defendants' conduct has caused and stands to cause etouches substantial and immediate irreparable injury, including the actual and potential loss of client relationships and goodwill, as well as confidential, proprietary, and trade secret information.

**CLAIM V**
**MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE CONNECTICUT UNIFORM TRADE SECRETS ACT CONN. GEN. STAT. §§35-50 ET SEQ. ("CUTSA") AND COMMON LAW**

121. Plaintiff restate and reaver each and every allegation contained in Paragraphs 1-120, inclusive of this Complaint and the acts of the Defendants asserted therein as if fully stated in this paragraph.

122. The actions of Defendants, as set forth herein, constitute a violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§35-50 et seq. ("CUTSA") and the common law.

123. Plaintiff possessed Plaintiff's Proprietary and Trade Secret Materials.

124. Defendants have used for its own purposes, Plaintiff's Proprietary and Trade Secret Materials in its wrongful possession.

125. As employees and members of the Senior Management Team of Plaintiff, the Individual Defendants had access to and used Plaintiff's Proprietary and Trade Secret Materials and Information in order to effectuate their employment with Plaintiff and work with Plaintiff's clients.

126. On information and belief, the Individual Defendants have used and otherwise misappropriated and continue to misappropriate Plaintiff's Proprietary and Trade Secret Materials and Information without etouches' express or implied consent, including trade secrets regarding etouches clients and prospective clients. These actions were taken with the knowledge and for the benefit of Swoogo.

127. The information used by Defendants is of extreme importance and value to the Plaintiff who has put in great effort, time, and cultivation of relationships with their clients in order to develop these trade secrets and now affords Plaintiff an advantage in the marketplace.

128. This information is closely held and not known outside the Plaintiff's business.

129. The information is not readily ascertainable by outsiders.

130. This information is only given to those parties absolutely necessary in order to preserve the secrecy of said information.

131. The Defendants acquired these trade secrets by improper means or under circumstances giving rise to a duty to maintain their secrecy and used them to the detriment of the Plaintiff.

132. Plaintiff has sustained damages and injury as a result of the Defendants' misappropriation of Plaintiff's Proprietary and Trade Secret Materials and Information and has damaged the integrity of Plaintiff's confidential information and business integrity.

133. The Defendants have used this information in order to try to disrupt the Plaintiff's relationship with their clients and to try and divert business away from the Plaintiff.

134. Defendant's conduct constitutes a violation of CUTSA.

135. Plaintiff will also suffer irreparable damage and injury due to Defendants misappropriation of the trade secret information if the Defendants are not enjoined from the use of such information. Plaintiff has no adequate remedy at law to compensate for the harms caused by the acts and conduct of Defendants.

136. Defendants' conduct has caused and stands to cause etouches substantial and immediate irreparable injury, including the actual and potential loss of client relationships and goodwill, as well as confidential, proprietary, and trade secret information.

**CLAIM VI**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**CONN. GEN. STAT. §§42-110 ET SEQ. ("CUTPA")**

137. Plaintiff restates and reavers each and every allegation contained in Paragraphs 1-136, inclusive of this Complaint and the acts of the Defendants asserted therein as if fully stated in this paragraph.

138. The acts and conduct of Defendants alleged above is unethical, unscrupulous, unfair and deceptive, and constitutes an unfair method of competition or trade practice in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§42-110 et seq. ("CUTPA").

139. Defendants conduct was intentional and willful.

140. Defendants' violation of CUTPA was carried out of the purpose of competing unfairly with etouches.

141. As a result of Defendants' violation of CUTPA, etouches has suffered damages an amount that cannot be presently determined.

**CLAIM VII**
**TORTIOUS INTERFERENCE**
**(AGAINST ALL DEFENDANTS)**

142. Plaintiff incorporates the allegations in Paragraphs 1 through 141.

143. Beneficial business relationships and business expectancies have existed, and do exist, between etouches and its current and prospective customers.

144. Defendants knew of these beneficial business relationships and business expectancies.

145. Upon information and belief, without privilege or justification, defendants have intentionally and tortiously interfered with these beneficial business relationships and business expectancies, as well as with Plaintiff's economic advantage, through their wrongful conduct.

146. Defendants undertook the complained of activities knowing about these beneficial business relationships and business expectancies and in willful and malicious disregard of them.

147. Defendants' actions have damaged Plaintiff in ways, extents and amounts to be further ascertained. In addition, defendants' actions have irreparably harmed and will continue to irreparably harm Plaintiff in ways and extents for which there is no adequate remedy at law.

**CLAIM VIII**
**UNFAIR COMPETITION AND FALSE ADVERTISING**
**IN VIOLATION OF 15 U.S.C. § 1125(a)**

148. Plaintiff repeats and realleges each of the allegations contained in Paragraphs 1 through 147 as if fully set forth herein.

149. Defendants have made and distributed in interstate commerce advertisements that contain false and misleading representations regarding its products and services. These advertisements contain false statements regarding the creation of Plaintiff's software and the exclusive capabilities of Swoogo's platform.

150. These advertisements actually deceive, or have a tendency to deceive, a substantial segment of relevant customers. This deception is material in that the attributes and inherent quality and characteristics of Swoogo's platform are likely to influence the purchasing decisions of consumers.

151. Defendants' false and misleading advertisements injure both consumers and Plaintiff.

152. Defendants' false and misleading advertising statements and omissions violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

153. The foregoing acts of unfair competition by Defendants have been willful, intentional and purposeful, in disregard of and indifference to Plaintiff's rights.

154. Plaintiff has been harmed by Defendants' false advertising of its products.

**CLAIM VIX**
**COMMON LAW UNFAIR COMPETITION**
**(AGAINST ALL DEFENDANTS)**

155. Plaintiff incorporates the allegations in Paragraphs 1 through 154.

156. Defendants' activities as above described constitute unfair competition in violation of the common law.

157. Defendants' actions have damaged Plaintiff in ways, extents and amounts to be further ascertained. In addition, Defendants' actions have irreparably harmed and will continue to irreparably harm Plaintiff in ways and extents for which there is no adequate remedy at law.

**WHEREFORE,** Plaintiff demands judgment in its favor against Defendants as follows:

1. On all claims for relief, awarding compensatory damages in an amount to be determined at trial on the merits of the action;
2. Punitive damages, in an amount to be determined at trial on the merits of the action;
3. Treble damages and attorney's fees as applicable under various Claims of the Complaint;
4. An order of the Court providing preliminary and permanent injunctive relief, restraining Defendants and the principals of the Defendants from:
   a. Disclosing, misappropriating or using any and all of the Plaintiff's Proprietary and Trade Secret Materials and Information;
   b. Destroying any and all documents contained on the Defendants' computers, electronic accounts, or from any other means by which the Defendants

maintain, hold, or keep any of the Plaintiff's Proprietary and Trade Secret Materials; and

c. Ordering Defendants to Return to Plaintiff all Plaintiff's Proprietary and Trade Secret Materials and Information

5. An award of legal fees and costs and disbursements of this action including any expenses; and

6. An award of any other and further relief to which Plaintiff is entitled, or that the court deems just, necessary, appropriate or proper based on the circumstances.

**DEMAND FOR JURY**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

By: /s/ Matthew C. Wagner
Matthew C. Wagner (ct25926)
mwagner@dmoc.com
Scott Centrella (ct05809)
scentrella@dmoc.com
Jane C. Christie (ct29636)
jchristie@dmoc.com
DISERIO MARTIN O'CONNOR & CASTIGLIONI, LLP
One Atlantic Street
Stamford, CT 06901
Telephone: (203) 358-0800
Facsimile: (203) 348-2321
*Attorneys for Plaintiff*

Dated: December 5, 2016